IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal Action No. 08-107-GMS |
| v. | ) | |
| | ) | |
| ERICK COLEMAN, | ) | |
| | ) | |
| Defendant. | ) | |

Luis A. Ortiz, Assistant Federal Public Defender, Federal Public Defender's Office, Wilmington, Delaware. Attorney for the Defendant.

John C. Snyder, Assistant United States Attorney, United States Department of Justice, Wilmington, Delaware. Attorney for the Prosecution.

**OPINION**

February __17__, 2009
Wilmington, Delaware

SLEET, Chief Judge.

## I.    INTRODUCTION

On July 24, 2008, the Grand Jury for the District of Delaware indicted Erick Coleman

("Coleman") on one count of possession of a firearm by a prohibited person, in violation of

18 U.S.C. § 922(g)(1) and 924(a)(2). Presently before the court is Coleman's Motion to Suppress

Evidence. The court held an evidentiary hearing in connection with this motion on December 3,

2008. The court subsequently directed the parties to file proposed findings of fact and conclusions

of law and convened oral argument on the motion. After having considered the testimony elicited

during the hearings and the arguments presented in the parties' submissions on the issues, the court

will deny Coleman's motion.

## II.   FINDINGS OF FACT

At the evidentiary hearing, the United States called one witness: Joshua Wilkers ("Wilkers"),

a patrolman with the Wilmington Police Department (the "WPD"). Coleman did not call any

witnesses. After listening to the testimony of the witness, and observing his demeanor, the court

concludes that Wilkers' account of the facts is credible. The following represents the court's

essential findings of fact as required by Rule 12(e) of the Federal Rules of Criminal Procedure.

At approximately 1:00 a.m., on July 1, 2008, Wilkers was conducting a vehicle stop with

Patrolman Tavis Miller ("Miller") in the 17th district, at the corner of Maple and Clayton Streets.

(See Transcript of Hearing on Defendant's Motion to Suppress ("Tr.") at 8-9.) Both Wilkers and

Miller were dressed in full uniform and riding in a fully marked WPD vehicle. (Id. at 9, 23.) While

conducting their traffic stop, the officers received a dispatch over the radio, calling for any unit that

could, to respond to the area of West Third Street and North Clayton Street[1] in regard to an armed subject. (Id. at 9, 24.) The radio dispatch, which was based on an anonymous tip, stated that a black male wearing a black t-shirt and a New York Yankees baseball cap was in possession of a firearm. (Id. at 9, 24-25.)

The officers, who were approximately three to four blocks away from Third and Clayton Streets, completed the traffic stop and responded to the area. (Id. at 10.) Miller was seated in the front passenger seat and Wilkers was driving. (Id. at 10-11.) Initially, the officers activated their emergency lights, but turned them off as they entered the 200 block of North Clayton Street. (Id. at 11, 24.) As they approached Third and Clayton Streets, Wilkers slowed down the vehicle so he and Miller could look for the individual who matched the description of the subject. (Id. at 13.) The officers did not observe the individual at the intersection of Third and Clayton Streets. However, Miller observed the individual sitting on the front porch of a residence approximately 75 feet from the intersection of Third and Clayton Streets and indicated this to Wilkers. (Id. at 13-15, 25-26, 31.) Wilkers brought the vehicle to a stop and looked to where Miller had indicated. (Id. at 14.) Wilkers observed an individual, later identified as Coleman, sitting on the front porch railing of the residence at 230 North Clayton Street, which was approximately 15 to 20 feet away from where Wilkers had stopped the vehicle. (Id. at 14-15.)

Both officers proceeded to exit the vehicle and approached the porch railing. (Id. at 15.) At this point in time, Wilkers had a clear view of the subject and was confident that he was the

---

[1] According to Wilkers, the area of Third and Clayton Streets is "a very high-in-drug-and-crime area," because there had been a high number of drug and firearm arrests, as well as numerous shootings in the area. (Tr. at 11-12.) Wilkers also testified that the area was mostly residential. (Id. at 12.)

individual reported over the radio dispatch. (Id. at 17.) Approximately 5 to 10 other individuals were in the general area, but none of them came close to matching the description provided by the anonymous tip. (Id. at 17.)

As the officers approached, the other individuals in the area "stood up and asked what was going on." (Id. at 19-20.) Coleman, however, did not respond the same way. (Id. at 20.) Instead of standing up, Coleman remained seated on the railing with his body "bladed away"[2] from the officers and his face looking straight at Wilkers. (Id. at 17.) That is, half of Coleman's back was facing Wilkers and half was concealed. (Id. at 18, 27.) Additionally, while Coleman's hands were concealed from view, Wilkers observed his arms and elbows. (Id. at 17-19, 32, 34-35.) Based on the position of his elbows and the top of his arms, Coleman's hands did not appear to be resting on his lap or knees but, rather, were pulled toward his abdomen as if he was grabbing or holding an object against his stomach and attempting to conceal it. (Id. at 17, 19, 27, 32-35.) Coleman also did not speak to the officers, but continued to look back at the officers with "an empty, blank stare on his face." (Id. at 18.) According to Wilkers, Coleman's behavior was "not normal," because most people either stand up or ask what is going on when he approaches. (Id.)

Based on Coleman's posture, the blank stare on his face, and his failure to stand up as the officers approached, in addition to the fact that he matched the description provided by the radio dispatch, Wilkers became concerned that he was armed. (Id. at 20-21.) Wilkers also became

___

[2] Wilkers described the term "blading" for the court as "a term used when people turn their body . . . away from [the officer] . . . in an attempt to conceal an item, conceal, contraband from [the officer], conceal a bulge in their pants or their jacket, and not try to give it away." (Id. at 8.) Wilkers also described the term "security check" for the court as something a person does when he is walking with a firearm in his waistband, that is, "continually reach[ing] over and grab[bing] it to make sure it's still there, adjust[ing] it and mak[ing] sure it doesn't fall out." (Id. at 7.) He testified that Coleman's actions were not consistent with a security check. (Id. at 19.)

3

concerned for his safety, Miller's safety, and the safety of the other individuals in the area, so he ordered Coleman to show his hands in a "loud and forceful" tone, drawing his Taser at one point.[3] (Id. at 21, 26, 33.) Coleman did not react to the orders – his posture and facial expression remained the same, and he did not say anything to Wilkers. (Id. at 21, 27, 33.) Wilkers put away his Taser, walked up to the porch, told Coleman to get on the ground, and grabbed Coleman's arm. (Id. at 21-22.) Coleman "didn't comply with anything [Wilkers] was trying to do," except to move his head to follow Wilkers as he walked up onto the porch. (Id. at 22.) Wilkers then pulled Coleman off of the railing with "a little force," and placed him on the ground face first without any resistance. (Id.) After handcuffing Coleman for officer safety, Wilkers rolled him over onto his right side in an attempt to help him stand. (Id. at 22, 28-29.) As he did so, Coleman's t-shirt came up and revealed a firearm in his waistband. (Id.) Wilkers recovered the firearm from Coleman's waistband. (Id. at 23.)

In addition to offering testimony regarding the incident on July 1, 2008, Wilkers testified regarding his training and expertise. Specifically, Wilkers has been assigned to the WPD's Patrol Unit since he joined the department in July 2005. (Id. at 4.) Prior to joining the WPD, Wilkers served for two years as a military police officer with the Air National Guard. (Id. at 5.)

While working as a patrol officer, Wilkers has participated in approximately 15 arrests of suspects in possession of concealed firearms. (Id.) He also has received training with respect to identifying suspects carrying concealed firearms. (Id.) During his time with the Air National Guard, Wilkers received training in conducting patrols, looking for suspicious activity, identifying

---

[3] Wilkers did not ask Coleman his name or ask any questions about the tip, because Coleman matched the description of the armed subject, and Wilkers was "a little more cautious" for his and Miller's safety. (Id. at 31.)

4

individuals who might be armed, and locating firearms on suspects. (Id. at 7.) Wilkers' training at the Wilmington Police Academy included classroom instruction on the characteristics of armed gunmen, taught by the Bureau of Alcohol, Tobacco, Firearms, and Explosives. (Id. at 5.) Wilkers also participated in simunitions training, a dynamic training exercise in which students are required to identify armed gunmen and locate concealed firearms on "suspects" played by instructors armed with soap pellet guns. (Id. at 5-6.) Finally, Wilkers attended in-service training on identifying characteristics of armed subjects on two occasions, and a further simunitions training session. (Id. at 6-7.) Wilkers' training taught him to look for a number of characteristics that suggest an individual may be carrying a gun, including swinging of jackets,[4] security checks, and blading. (Id. at 7.)

### III.   CONCLUSIONS OF LAW

In his motion to suppress, Coleman first contends he was unlawfully seized when Wilkers walked onto the private property of 230 North Clayton Street and ordered him to show his hands. Thus, Coleman argues that he was seized during the entirety of his encounter with Wilkers and Miller. The government disagrees, contending that Coleman's initial encounter with the officers was consensual, and that he was not seized until he submitted to Wilkers' show of authority when Wilkers removed him from the porch railing. Coleman further contends that the seizure was an unreasonable encroachment on his Fourth Amendment rights. Therefore, the court must first determine when Coleman was seized and then determine whether the seizure comports with the reasonable suspicion standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v.*

---

[4] Wilkers described "swinging of jackets" as something he would observe, which indicates the presence of a firearm in a jacket pocket. (Id. at 7.)

5

*Crandell*, --- F.3d ---, 2009 WL 197981, at *3 (3d Cir. 2009) ("Before even addressing whether the police had reasonable suspicion to approach [and engage an individual], the District Court [must first inquire] into whether [the individual was] seized by the police within the meaning of the Fourth Amendment.") (internal quotations and citation omitted).

### A.    When was Coleman Seized?

The Fourth Amendment's protection against unreasonable seizures includes a seizure of the person. *California v. Hodari D.*, 499 U.S. 621, 624 (1991). A person is seized for *Terry* purposes when, "taking into account all of the circumstances surrounding the encounter, the police conduct would . . . 'communicate[] to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (quoting *Kaupp v. Texas*, 538 U.S. 626 (2003)). That is, a seizure occurs when there is either (a) "a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful," or (b) "submission to the assertion of authority." *Hodari D.*, 499 U.S. at 626. It is well established, however, that a seizure does not occur "when an officer approaches an individual in a public place, identifies himself as a law enforcement agent, and asks questions." *United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005) (citations omitted). Further, law enforcement officers may pose questions and ask for identification even when they have no basis for suspecting a particular individual, as long as they do not use coercive measures to secure cooperation. *See id.* (citing *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991)). The Fourth Amendment, however, requires an officer to be able to articulate specific facts justifying an intrusion "when the interaction ceases to be consensual, that is, when a reasonable person would no longer 'feel free to decline the officers' requests or otherwise terminate the encounter.'" *Johnson*, 332 F.3d at 205 (quoting *Bostick*, 501

6

U.S. at 436). In *United States v. Mendenhall*, the Supreme Court cited several circumstances "that might indicate a seizure, even where the person did not attempt to leave, including the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Crandell*, 2009 WL 197981, at \*3 (quoting *Mendenhall*, 446 U.S. 544, 554-55 (1980)). Finally, "[a]ttempted seizures of a person are beyond the scope of the Fourth Amendment." *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 n. 1 (1998)).

Here, Coleman contends that he was seized when Wilkers ordered him to show his hands, because a reasonable person would have no longer felt free to terminate the encounter. Coleman relies on *Mendenhall* and *Johnson* to support his argument. Conversely, the government urges the court to find that Wilkers did not seize Coleman until he removed Coleman from the railing, because Coleman did not submit to Wilkers' show of authority until that time. The government relies on *Hodari D.* to support its argument.

After having considered the parties' arguments, as well as the supporting case law, the court concludes that Wilkers seized Coleman when he forcefully and repeatedly ordered Coleman to show his hands. The court reaches this conclusion after a careful examination of *Mendenhall, Hodari D.*, and Third Circuit precedent in the area of search and seizure. In *Mendenhall*, three agents of the Drug Enforcement Agency approached Mendenhall in an airport in order to ask her some questions, because she fit the profile of a drug courier. 446 U.S. at 447-48. In concluding that the agents had not seized Mendenhall, the Supreme Court stated:

> a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might

7

> indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Id.* at 554 (footnote and citations omitted). The Court later modified the *Mendenhall* test in *Florida v. Bostick*, inquiring whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." 501 U.S. at 435-46.

In *Hodari D.*, officers on patrol in an unmarked car rounded a corner and observed four or five youths huddled around a car parked at a curb. 499 U.S. at 622-23. The youths fled upon seeing the officers. *Id.* The officers became suspicious and gave chase. *Id.* at 623. During the pursuit, an officer saw Hodari discard what appeared to be a small rock, which was later determined to be crack cocaine. *Id.* The officer then tackled and handcuffed Hodari. *Id.* In determining that Hodari had not been "seized" at the time he discarded the crack cocaine, the Court discussed the situation of a fleeing felon, noting that the definition of the word seizure "does not remotely apply . . . to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee." *Id.* at 626. The Court then concluded that a fleeing felon who does not yield to an officer's show of authority has not been seized within the meaning of the Fourth Amendment, because "an arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *Id.* (emphasis in original).[5]

---

[5] Recently, the Supreme Court discussed both *Hodari D.* and *Mendenhall* in determining whether a traffic stop entails a seizure of a passenger in *Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400 (2007). In *Brendlin*, the court reaffirmed the *Hodari D.* "force or submission" test and clarified the situations in which the *Mendenhall* test applies. Specifically, the court stated that the *Mendenhall* test applies to a court's determination of when a seizure occurs in response to authority "[w]hen the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence." 551 U.S. at ---, 127 S.Ct. at 2405. There, the police stopped a car to verify a

The Third Circuit has applied the tests set forth by both *Mendenhall* and *Hodari D.* to determine the point in time that a seizure has occurred. It appears, however, that the court does not always apply the same test for determining when a seizure occurred. In cases that do not involve a fleeing felon, the Third Circuit has applied the *Mendenhall-Bostick* "would a reasonable person feel free to terminate the encounter" test to determine whether a seizure has occurred. *See, e.g., Johnson*, 332 F.3d 199. In cases involving a fleeing felon, the Third Circuit has applied the *Hodari D.* "physical force or submission to a show of authority" test to determine whether an individual has been seized. *See, e.g, Valentine*, 232 F.3d 350.

---

temporary permit and renewal of registration. *Id.* at 2404. After asking the driver for her license, one of the officers noticed Brendlin and knew that he had dropped out of parole supervision. *Id.* The officer called for backup and, when it arrived, walked over to the passenger side of the door, ordered Brendlin out of the car at gunpoint, and declared him under arrest. *Id.* Brendlin claimed that the traffic stop was an unlawful seizure of his person. *Id.* The State of California conceded that the police had no adequate justification to pull over the car, but argued that Brendlin was not seized within the meaning of the Fourth Amendment. *Id.* at 2406. The Court resolved the issue "by asking whether a reasonable person in Brendlin's position when the car stopped would have believed himself free to 'terminate the encounter' between the police and himself." *Id.* (quoting *Bostick*, 501 U.S. at 436). The court then determined that "any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission." *Id.* at 2406-47.

In addressing the California Supreme Court's assumption that Brendlin, as a passenger, had no ability to submit to the officer's show of authority, the court noted "what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Id.* at 2409 (positing that Brendlin "apparently" submitted by remaining inside the vehicle once it came to a stop). *Brendlin*, therefore, at least implicitly establishes that the *Hodari D.* test is not instructive in situations where the defendant lacks movement, and that the proper test in these situations is whether a reasonable person would have felt free to terminate the encounter with law enforcement. *See also* 4 W. LaFave, Search & Seizure § 9.4(d), p. 464-65 (4th ed. 2004) (identifying situations – such as no movement by an individual or movement by an individual in an effort to terminate a consensual encounter – in which the *Hodari D.* 'force . . . or . . . submission" test is not helpful to a court).

In *Johnson*, a civil case, the plaintiff claimed that an officer with the Dewey Beach Police Department (the "DBPD") lacked reasonable suspicion to seize him. 332 F.3d at 201. Johnson was a guest at a Dewey Beach motel and stopped into the motel office after arriving. *Id.* The clerk on duty believed that Johnson was acting suspicious and had her husband call the DBPD to check on her welfare. *Id.* When the officers arrived at the motel, the clerk gave a description of the suspicious looking guest. *Id.* at 202-03. One of the officers left the motel office to search for a man matching the description and found Johnson, who matched the description, sitting in the driver's seat of a green van reading a newspaper. *Id.* at 203. The officer approached the van, and gestured to Johnson to roll down his window. *Id.* Johnson did not comply. *Id.* After the officer asked several more times, Johnson rolled down the window a few inches. The officer asked for identification, which Johnson refused to provide. *Id.* Further conversation ensued, and Johnson eventually was arrested for disorderly conduct. *Id.* On appeal, Johnson argued that he was seized at the moment the officer asked him to roll down his window. *Id.* at 206. The officer argued that the stop began at some point after Johnson repeatedly refused to cooperate with his orders. *Id.*

The Third Circuit had to determine, among other issues, at what moment Johnson was seized. *Id.* at 205. The court concluded that the answer to that question occurred somewhere between both parties' positions – that is, not at the exact moment of the encounter, but also not after Johnson repeatedly failed to comply with the officer's orders. *Id.* at 206. According to the court, the seizure occurred at the moment when it became clear that Johnson could not refuse the officer's requests. *Id.* Put differently, the court stated: "Although Johnson may have felt free to decline . . . [the officer's] initial request to roll down the window, the very next moment, when [the officer] persisted rather than accepting Johnson's choice not to acquiesce, the interaction became a stop. At that time,

10

[the officer] made it clear that Johnson was not free to ignore him and would not be left alone until he complied." *Id.*

In *Valentine*, officers were patrolling an area in New Jersey that was "very bad" with "[a] lot of shootings," when a black male flagged them down and explained he had just seen a man with a firearm. 232 F.3d at 352. The informant, who refused to identify himself, provided a description of the man with the firearm and noted that he was accompanied by a young male. *Id.* The officers went to search for the gunman and saw three men standing nearby in a well-lit parking lot. *Id.* at 353. One of the men matched the informant's description of the armed suspect and another was a young male. *Id.* The officers, who were in uniform and a marked vehicle, stopped and stepped out of their vehicle. *Id.* The men responded by walking away. *Id.* One of the officers ordered the young male to stop, and he obeyed. *Id.* Another officer told Valentine to come over and place his hands on the car. Valentine responded "Who, me?" and charged toward the officer. *Id.* The officer grabbed Valentine's shirt and wrestled him to the ground. During the scuffle, a handgun fell to the ground. *Id.*

The Third Circuit had to determine whether the officers had reasonable suspicion to stop and frisk Valentine. To reach its conclusion, the court had to determine whether the reasonable suspicion inquiry needed to be confined to events that occurred before the officer ordered Valentine to stop. *Id.* at 357. In rejecting the district court's analysis, which held that the reasonable suspicion inquiry must be confined to pre-order events, the court noted that the district court's analysis

> did not take into account that there can be no Fourth Amendment violation until a seizure occurs. In *Hodari D.* the Supreme Court held that for there to be a seizure, the police must apply physical force to the person being seized or, where force is absent, have the person seized submit to a show of police authority. Thus, if the police make a show of authority and the suspect does not submit, there is no seizure.

11

*Id.* at 358 (citations omitted) ("[T]he facts of *Hodari D.* illustrate how the concept of a seizure should be applied."). Ultimately, the court found that Valentine did not submit to the officer's show of authority and that Valentine was not seized until the officer wrestled him to the ground. *Id.* at 359.

In the present case, Coleman did not flee in response to Wilkers' order to show his hands. Indeed, Coleman made no movement at all, but instead continued to stare at the officer. Thus, the facts of both *Brendlin* and *Johnson*, while not on all fours with the present case, most closely match Coleman's encounter with Wilkers. As such, the court will apply the *Mendenhall* test to the facts of the present case. Here, as soon as Wilkers stepped toward the porch where Coleman was sitting, he forcefully and repeatedly ordered Coleman to show his hands. At that point in time, Wilkers made it clear that Coleman was not free to ignore him and would not be left alone until he complied. In other words, a reasonable person in Coleman's position would not feel free to terminate the encounter. Thus, the court concludes that Wilkers seized Coleman for purposes of the Fourth Amendment when he ordered Coleman to show his hands.[6]

---

[6] In today's cities, police "jump-outs" are prevalent, see Jump-outs: A Deterrent or Profiling, News J. (Wilmington, Del.) July 20, 2008, at A1; Lee Williams & Adam Taylor, 'Jump Out' Squads Seen as a Violation of Civil Rights, News J. (Wilmington, Del.), Feb. 21, 2005, at A7, and orders are often given to officers by their superiors to stop every person walking the streets in particular areas of a city. *See United States v. Smith*, Criminal Action No. 08-08, 2008 WL 2897076, at *1 (D. Del. July 29, 2008). Thus, it is not difficult to fathom a situation in which an officer lacking reasonable suspicion in the first instance can convert an otherwise illegal seizure into a legal seizure by ordering the targeted individual to stop. If the individual exercises his right to walk away, as he is free to do under *Terry* and other Fourth Amendment jurisprudence, he risks arrest and search by the officer. In addition, he places that conduct within the court's purview for its reasonable suspicion analysis. *Valentine*, 232 F.3d at 359 ("[W]hat [the defendant] did after he failed to comply with the police officers' orders can be considered in evaluating reasonable suspicion."). If the individual complies with the order, he risks arrest and search by the officer. Colloquially speaking, one could say that the individual is damned if he does and damned if he doesn't, because in either case he will be arrested and searched – the

**B.      Was Coleman's Seizure Based on Reasonable Suspicion?**

Having determined when Wilkers seized Coleman, the court now turns to whether the seizure

was based on reasonable suspicion. *Terry*, 392 U.S. at 19 (determining reasonableness after

establishing when the seizure occurred). A police officer "may, consistent with the Fourth

Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable

suspicion that criminal activity is afoot." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir.

2002) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)); *see also Terry*, 392 U.S. 1 at 22-24.

Under *Terry* and its progeny, reasonable, articulable suspicion of criminal activity has been defined

as "specific and articulable facts which, taken together with rational inferences from those facts,

reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21. "An officer's objective basis for

suspicion must be particularized because the 'demand for specificity in the information upon which

police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence.'"

*United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) (quoting *Terry*, 392 U.S. at 22 n. 18). At

the same time, courts must permit "officers to draw on their own experience and specialized training

---

individual simply has no option. As previously noted by this court, *Hodari D.* recognizes this
risk, but errs on the side of compliance with police orders. *Smith*, 2008 WL 2897076, at * 3 n. 7.

Accordingly, applying the *Hodari D.* test in a situation analogous to that posed above
seems to eviscerate the reasonable suspicion standard set forth in *Terry*, or create a loophole
around *Terry* and its progeny, as aptly noted by the dissent in *Hodari D.* 499 U.S. at 637-39; *see
also United States v. Swindle*, 407 F.3d 562, 572-73 (2d Cir. 2005) (discussing the *Mendenhall*
and *Hodari D.* seizure tests and noting that, following *Hodari D.*, it must affirm a conviction that
was achieved with evidence obtained by an abuse of power, *i.e.* an unreasonable order to stop).
Moreover, at least one commentator has noted that "*Hodari D.* is wanting," even from the
standpoint of easing the burden on lower courts regarding the drawing of critical Fourth
Amendment distinctions for purposes of determining precisely when a seizure has occurred. W.
LaFave, *supra*, p. 462-63; *Id.* at 461 (quoting the dissenters in *Hodari D.* and lamenting that "the
holding in *Hodari D.*, if carried to its logical conclusion will encourage unlawful displays of
force that will frighten countless innocent citizens into surrendering whatever privacy rights they
may still have.").

13

to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks and citations omitted). Thus, "[t]he ultimate question is whether a reasonable, trained officer standing in [Wilkers'] shoes could articulate specific reasons justifying [Coleman's] detention." *Johnson*, 332 F.3d at 206.

Courts must consider the "totality of the circumstances" in determining whether reasonable suspicion existed. *See United States v. Sokolow*, 490 U.S. 1, 8 (1989). The factors that informed Wilkers' decision to stop and patdown Coleman were: (1) the radio call communicating the anonymous tip, which stated that a black male wearing a black t-shirt and a New York Yankees baseball cap was in possession of a firearm on the corner of West Third and North Clayton Streets; (2) Coleman's presence approximately 75 feet from the corner of West Third and North Clayton Streets; (3) Coleman's match to the description of the individual communicated in the radio call; (4) the lateness of the hour, i.e. Wilkers received the radio call at 1:00 a.m.; (5) Wilkers' knowledge that the area of West Third and North Clayton Streets was a high crime area with a number of shootings occurring there; (6) the response of others to the police presence and Coleman's non-response; (7) Coleman's posture; and (8) Coleman's failure to submit to or follow Wilkers' order to show his hands.[7]

The first three factors on which the government relies are the radio call communicating the tip to Wilkers, Coleman's presence near the corner of West Third and North Clayton Streets, and Coleman's match to the description provided in the tip. A tip, however, is not reliable merely

---

[7] Having already determined that Wilkers seized Coleman when he forcefully and repeatedly commanded Coleman to raise his hands, the court does not consider Coleman's failure to follow the order in its reasonable suspicion analysis.

14

because "its description of the suspect's visible attributes prove[s] accurate." *Florida v. J.L.*, 529

U.S. 266, 271 (2000). "[R]easonable suspicion . . . requires that a tip be reliable in its assertion of

illegality, not just in its tendency to identify a determinate person." *Id.* at 272. In the present case,

the radio tip was nothing more than Coleman's "readily observable location and appearance," which

is insufficient on its own to support a finding of reasonable suspicion. *Id.*

     As the Supreme Court has stated, "if a tip has a relatively low degree of reliability, more

information will be required to establish the requisite quantum of suspicion than would be required

if the tip were more reliable." *Alabama v. White*, 496 U.S. 325, 330 (1990). In *United States v.*

*Brown*, the Third Circuit noted factors that both the Supreme Court and it have previously identified

as suggesting suspicious behavior, including: (1) the presence of an individual in a high crime area;

(2) the lateness of the hour; (3) an individual's "nervous, evasive" behavior; and (4) an individual's

acts in conformance with the police officer's specialized knowledge of criminal activity. 448 F.3d

at 251 (collecting cases for the various propositions) (citations omitted). The court further noted that

while the factors standing alone "may be insufficient to establish reasonable suspicion, [] if observed

by police they can serve to corroborate an otherwise insufficient tip." *Id.*

     At the outset, the court notes that this is a close case. Wilkers, however, observed a number

of factors indicating suspicious behavior, which served to corroborate the otherwise unreliable tip.

As Wilkers testified at the suppression hearing, the area of West Third and North Clayton Streets is

"a very high-in-drug-and-crime area," because there had been a high number of drug and firearm

arrests, as well as numerous shootings in the area. Additionally, it is undisputed that the incident

occurred late in the night, at approximately 1:00 a.m. Finally, Wilkers testified regarding Coleman's

posture and behavior which, based on his specialized knowledge and training in the area of

15

concealed firearms, raised his suspicion that Coleman possessed a concealed weapon.

Specifically, Wilkers testified that as he and Miller approached, the other individuals in the area "stood up and asked what was going on." Coleman, however, responded differently, in that he remained seated on the porch railing with half of his back facing Wilkers and half concealed. Additionally, Wilkers observed that Coleman's hands appeared to be pulled into his abdomen as if he were grabbing or holding an object against his stomach and attempting to conceal it. Coleman also did not speak to the officers. Instead, he simply continued to look back at them with "an empty, blank stare on his face." According to Wilkers, Coleman's behavior – which differed from the behavior of everyone else – and posture raised his suspicion that Coleman was concealing a weapon. Given the foregoing, the court concludes that Coleman's behavior combined with the high crime area and lateness of the hour corroborated a tip of relatively low reliability and provided Wilkers with reasonable suspicion to seize Coleman and pat him down for weapons.[8] The court, therefore, will deny Coleman's motion to suppress.

---

[8] The court notes that it would reach the same result regardless of when Wilkers seized Coleman during the encounter. If the seizure occurred later in the encounter, the court would have considered Coleman's conduct up to that point, including his failure to comply with Wilkers' Orders.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No.  08-107 GMS |
| | ) | |
| ERICK COLEMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED that:

    1.    The defendant's Motion to Suppress Evidence (D.I. 17) is DENIED.


Dated: February 17 , 2009

CHIEF, UNITED STATES DISTRICT JUDGE